# In the United States Court of Federal Claims

No. 14-216C
(Filed Under Seal: July 23, 2014 | Reissued: August 28, 2014)*

| | | |
|---|---|---|
| BAILEY TOOL & MFG. COMPANY, | ) | |
| | ) | |
| | ) | Pre-Award Bid Protest; Motion for |
| Plaintiff, | ) | Judgment on the Administrative Record; |
| | ) | RCFC 52.1; Small Business |
| v. | ) | Administration (SBA); Responsibility; |
| | ) | Certificate of Competency (COC); |
| THE UNITED STATES, | ) | Adequate Financial Resources or Ability |
| | ) | to Obtain Them; FAR 9.104-1(a); FAR |
| Defendant. | ) | 9.104-3(a) |
| | ) | |
| | ) | |

*Frank Vincent Reilly*, Fort Lauderdale, FL, for plaintiff

*Alexis J. Echols*, Civil Division, United States Department of Justice, Washington, DC, for defendant

## OPINION AND ORDER

KAPLAN, Judge:

In this pre-award bid protest, Plaintiff Bailey Tool & Manufacturing Company (BTM) challenges the determination by the United States Army that BTM failed to establish its responsibility, which resulted in BTM's elimination from the competition for a contract to produce, test, and deliver M303 Blast Demolition Kits (BDKs).[1]  Specifically, BTM disputes the contracting officer's conclusion that BTM lacked "adequate financial resources to perform the contract" within the meaning of FAR 9.104-1(a).  It argues that the contracting officer violated applicable regulations when, after issuing her financial non-responsibility decision, she declined to give BTM an additional opportunity to submit evidence of newly obtained third-party

---

* This Opinion was originally issued under seal, and the parties were given the opportunity to request redactions.  In light of the parties' suggested redactions, the opinion is now reissued with redactions indicated by brackets.

[1] "The M303 BDK provides Warfighters with inert hardware, which when loaded with C4 explosive at the user level downrange, will provide a wide range of demolition capabilities." Corrected Administrative Record ("CAR") 89.

financing that BTM claims would have established its "ability to obtain resources" within the meaning of FAR 9.104-3(a). According to BTM, a contracting officer is legally obligated to consider any new information related to an offeror's ability to obtain resources up until the time a contract award is issued. In the alternative, BTM argues that—even if not legally required—the contracting officer's decision not to consider the new evidence under the circumstances of this case was arbitrary and capricious.

Currently before the Court are the parties' cross motions for judgment on the administrative record. For the reasons set forth below, the Court grants the government's motion and denies the plaintiff's motion.

## BACKGROUND

On January 16, 2013, the Army Contracting Command issued Solicitation No. W15QKN-13-R-0040 for the "planning, management, procurement, manufacturing, testing, inspection, Load, Assembly and Pack (LAP), packaging, and delivery of the M303 BDK." CAR 89. The solicitation was a 100 percent small business set-aside, and it contemplated the award of a five-year, firm fixed price (FFP) indefinite delivery indefinite quantity (IDIQ) contract with a minimum guarantee of approximately $1.1 million. CAR 2-3. The solicitation called for a negotiated procurement, under which the offeror representing the best value would receive the award. CAR 1, 83.

The Army received only two offers for this solicitation, including BTM's. See Def.'s Cross Mot. & Resp. Pl.'s Mot. J. Admin. R. 10 n.3, ECF No. 16 [hereinafter Def.'s Mot.]. Of the two, the Source Selection Authority determined that BTM was the apparent successful offeror. See CAR 694. Before the award was made, however, the Defense Contract Management Agency (DCMA) performed a pre-award financial capability review at the request of the contracting officer to assess BTM's financial capability to perform the contract. CAR 663-70. DCMA reviewed BTM's financial statements [

], and information obtained from the System for Award Management. CAR 664. In July 2013, DCMA issued its report regarding BTM's financial responsibility. See id. On a scale of "Low-Moderate-High," DCMA determined that BTM presented a High financial risk for this solicitation. Id. As a result of BTM's high financial risk factor, DCMA found BTM to be financially incapable of performing the contract and recommended "No Award." See CAR 663.

Concerned that the DCMA's report jeopardized their chances for award, BTM requested that the contracting officer reconsider an earlier request for progress billing,[2] asserting that such an arrangement would cure the problems perceived by the DCMA. See CAR 699. BTM argued

---

[2] Progress payment is a method of contract financing authorized under the Federal Acquisition Regulations (FAR). Under this method, payments are made during the performance of the contract and before completion of the work. Pursuant to FAR 32.102, progress payments are made on the basis of either a percentage or stage of completion or the incurrence of costs. Ralph C. Nash, Jr. et al., The Government Contracts Reference Book 458-59 (3d ed. 2007).

that, "while we do not refute the findings of the DCMA financial audit, this is a snap-shot in time, and doesn't convey the [                    ] financial situation at BTM." CAR 700. BTM also cited its successful performance of other contracts [                         ] and its upcoming paydays for that work.  CAR 699-700.  Given these considerations, BTM averred, "we expect that a substantial portion, if not all of our working capital issues will cure [

].ˮ CAR 701.

On December 6, 2013, the contracting officer referred the matter of BTM's financial capability to the Small Business Administration ("SBA") pursuant to section 8(b)(7) of the Small Business Act, 15 U.S.C. § 637(b)(7) (2006).[3]  See CAR 694.  On December 11, 2013, the SBA contacted BTM to advise the firm that, based on the contracting officer's findings and DCMA's financial analysis, there was sufficient reason to doubt BTM's financial capability to support the proposed contract.  CAR 729.  The SBA informed BTM that it could pursue a certificate of competency ("COC") by completing and submitting a COC application.[4]  Id.

On December 19, 2013, BTM submitted its COC application to the SBA.  Def.'s Mot 5. The application included a questionnaire, the details of [

].  CAR 731-817.  In the application, BTM stated that it was "unable to obtain a letter of commitment from its [                 ] lender in the timeframe allotted for the [COC] process," but that BTM's lender, [                 ], "expressed an interest verbally in considering a funding action" for the proposed contract.  CAR 808.

In conducting her review, the SBA Financial Specialist spoke with [a representative from BTM's lender] to verify that [BTM's lender] intended to provide a line of credit to enable BTM to perform the proposed contract.  CAR 825.  In that conversation, the lender represented that it would not be able to approve a new line of credit for BTM.  Id.  The bank "considered underwriting a [line of credit] with a SBA [Export Working Capital Program] loan program guaranty of 90% . . ., but after consulting with [the SBA, BTM's lender] was advised that this was not possible." Id.  [BTM's lender] verified that BTM was [

].  Id.[5]  Ultimately, the SBA Financial Specialist concluded that, "[b]ased on an overall analysis of [BTM's] current financial position it is believed that [BTM] does not have the

---

[3] Under this section of the Small Business Act, the SBA has authority to certify prospective small-business contractors "with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity . . . to receive and perform a specific Government contract."  15 U.S.C. § 637(b)(7).

[4] "A COC is a written instrument issued by the SBA to a government contracting officer. It certifies that a small business concern possesses the responsibility to perform a specific procurement contract."  Centech Grp., Inc. v. United States, 554 F.3d 1029, 1033 (Fed. Cir. 2009) (citing 13 C.F.R. § 125.5(a)(1) (2008)).

[5] The SBA Financial Specialist noted, however, that BTM was [
                    ].  CAR 825.

current financial capacity to perform this contract." CAR 826.  Moreover, she noted, "[n]o documentation and/or indication has been given that [BTM] has access to the capital needed to fulfill this contract." Id.

On January 2, 2014, the COC Review Committee met to determine whether it should issue a COC to BTM for the proposed contract.  CAR 818-22.  Although BTM had been issued a COC for each of two previously awarded contracts, after reviewing the Financial Specialist's report, the COC Committee found that "[t]he file [was] legally sufficient to support SBA's determination" of non-responsibility.  CAR 818.

On January 15, 2014, pursuant to FAR 15.503(a), the contracting officer notified BTM that it had officially been eliminated from the competition for the proposed contract.  CAR 702-03.  The contracting officer stated that, "[s]ince both DCMA and the SBA have found that BTM has not demonstrated adequate financial capacity to perform the contract at two separate occasions, this office has determined BTM non-responsible for this requirement . . . and therefore no longer eligible for the M303 BDK award."  CAR 702.  The contracting officer also addressed BTM's request for progress payments, stating that, "to be considered for progress payments, you must first be considered responsible for the award; therefore this request will not be considered."  Id.  Finally, the contracting officer explained that BTM's expectation of [                                                    ] could not change her responsibility determination: "all working capital issues must be resolved at time of award to be considered responsible (FAR 9.104-3(a)).  Acceptable evidence normally consists of a commitment or explicit arrangement that will be in existence at the time of contract award, [              ]."  CAR 703.

On January 17, 2014, a representative from BTM emailed the contracting officer, informing her that BTM had "just received a verbal funding commitment for the full M303 project."  CAR 704.  According to BTM, the lender would provide a written credit commitment on January 21, 2014.  Id.  The contracting officer responded to BTM's January 17 email on January 21, the date that BTM had stated that it would be providing the written commitment.  CAR 705.  It advised BTM that its elimination from the competition remained in effect and that "no further consideration will be granted at this time."  Id.

Contending that the contracting officer's refusal to consider additional information was error, BTM filed its pre-award bid protest in this Court on March 18, 2014.  The parties filed cross motions for judgment on the administrative record, and the Court heard arguments on those motions on July 17, 2014.

## DISCUSSION

### I.    Jurisdiction

This Court has jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3784 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b)), which provides:

> [T]he Unite[d] States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

An "interested party" is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Competition in Contracting Act, 31 U.S.C. § 3551(2)(A); see also Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006).

"The posture of a protest determines the evidentiary showing necessary to establish a 'direct economic interest.'" Miles Constr., LLC v. United States, 108 Fed. Cl. 792, 797 (2013). As the Federal Circuit elucidated in Orion Technology, Inc. v. United States, "[g]enerally, to prove the existence of a direct economic interest, a party must show that it had a 'substantial chance' of winning the contract." 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citations omitted). An exception to that general rule applies when a prospective offeror challenges the terms of the solicitation itself, before actually submitting a proposal. Id. "In that circumstance, the protestor can establish standing by demonstrating that it suffered a 'non-trivial competitive injury which can be redressed by judicial relief.'" Id. (quoting Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1361 (Fed. Cir. 2009)).

In this case, the general rule applies. BTM is an actual offeror challenging the agency's application of responsibility requirements. Therefore, BTM's standing depends upon whether— had the agency not committed the legal error alleged in its complaint by finding BTM non-responsible—it would have had a "substantial chance of winning the contract." See G4S Tech. CW LLC v. United States, 109 Fed. Cl. 708, 719 (2013) ("[A] bidder has standing to challenge the lawfulness of discretionary acts that operate to exclude the bidder from consideration in cases where the bidder's ratings are such that had the government acted lawfully the bidder would have had a substantial chance of winning the contract.").

BTM's allegations are clearly sufficient to establish its standing under this standard. It claims that the agency committed legal error by declining on January 21, 2014 to consider additional evidence of newly obtained third-party financing that BTM claims would have established its "ability to obtain resources" within the meaning of FAR 9.104-3(a). Assuming these allegations are correct, as the apparent successful offeror before the contracting officer excluded it from the competition, BTM had a substantial chance of winning the contract, were it not for the acts that BTM challenges in this protest. Accordingly, this Court has jurisdiction over BTM's claims under 28 U.S.C. § 1491(b).

## II.     Standards for Judgment on the Administrative Record

RCFC 52.1, which governs motions for judgment on the administrative record, "provide[s] for trial on a paper record, allowing fact-finding by the trial court." Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Therefore, the standard of review for a motion for judgment on the administrative record differs from that for a motion for summary

judgment. Id. at 1354-55.  Unlike summary judgment, for instance, "a genuine dispute of material fact does not preclude a judgment on the administrative record." Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 751 (2012).  To the contrary, "[t]o review a motion or cross-motions under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 630 (2014).

In a bid protest, the Court reviews the agency's action pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  Accordingly, the Court must uphold the agency action unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Banknote Corp. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  An agency action is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Alabama Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  In other words, the Court's role is limited to "determin[ing] whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Weeks Marine, 575 F.3d at 1358 (quoting PGBA, LLC v. United States, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)).

## III.   Merits Analysis

### A.   The Regulatory Standards

As codified in FAR 9.103, the government's policy is to award contracts to "responsible prospective contractors only." FAR 9.103(a).  "Responsibility refers to an offeror's apparent ability and capacity to perform all contract requirements." Centech Grp., Inc., 554 F.3d at 1034 n.2.  A prospective contractor's ability to perform the contract encompasses seven specific elements, all set forth in FAR 9.104-1.  Most significant for purposes of this case is the requirement that the prospective contractor possess "adequate financial resources to perform the contract, or the ability to obtain them." FAR 9.104-1(a).

The burden of establishing responsibility is on the offeror.  FAR 9.103(c) ("A prospective contractor must affirmatively demonstrate its responsibility."); OSG Prod. Tankers LLC v. United States, 82 Fed. Cl. 570, 576 (2008).  Further, FAR 9.104-3(a) provides that "the contracting officer shall require acceptable evidence of the prospective contractor's ability to obtain required resources," specifying that such evidence "normally consists of a commitment or explicit arrangement, that will be in existence at the time of contract award, to rent, purchase, or otherwise acquire the needed facilities, equipment, other resources, or personnel."

Special procedures exist for establishing the responsibility of a small business offeror such as BTM.  For example, "[u]pon determining and documenting that an apparent successful small business offeror lacks certain elements of responsibility," the contracting officer must

withhold the contract award and refer the matter to the SBA for review and for a determination of whether the offeror is eligible for a COC.  FAR 19.602-1; 13 C.F.R. § 125.5.  If the SBA grants a COC to the offeror, this grant "is conclusive as to responsibility" and requires the contracting officer to award the contract to that offeror.  13 C.F.R. § 125.5(m); 15 U.S.C. § 637(b)(7)(C).  On the other hand, if the SBA denies a COC to the offeror, this "[d]enial . . . does not preclude a contracting officer from awarding a contract to the referred firm," 13 C.F.R. § 125.5(n), provided that the contracting officer has made "an affirmative determination of responsibility" based upon "information sufficient to be satisfied that [the] prospective contractor currently meets the applicable standards."  FAR 9.103(b), 9.105-1(a).  In other words, "[t]he SBA's refusal to issue a COC does not prevent the contracting officer from later reversing [her]self, on the basis of new evidence."  Cavalier Clothes, Inc. v. United States, 810 F.2d 1108, 1111 (Fed. Cir. 1987).

While the contracting officer may accept new evidence and "allow a contractor to cure problems related to its responsibility, . . . [s]he may also properly make a nonresponsibility determination based on the existing record, without giving the contractor an opportunity to explain or defend against adverse evidence."  John C. Grimberg Co. v. United States, 185 F.3d 1297, 1303 (Fed. Cir. 1999); see also Impresa, 238 F.3d at 1334-35 ("Contracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." (quoting John C. Grimberg Co., 185 F.3d at 1303)).  Thus, although the contracting officer has discretion to consider additional responsibility information from a prospective contractor, the contracting officer is under no obligation to consider such information before making an ultimate decision of nonresponsibility.  Id.

### B.      Application of the Standards to this Case

BTM's central argument in this case is that the agency committed legal error when it refused to consider BTM's proffer of a loan commitment letter that BTM contends would have established that it had the ability to obtain adequate financial resources to perform the contract.  As described in greater detail below, this argument is unpersuasive.  Considering the broad leeway afforded to contracting officers to decide how much information is needed to make a responsibility determination, the contracting officer's decision here to eliminate BTM from the competition was well within the bounds of her discretion and was neither unreasonable nor contrary to law.

Thus, when the contracting officer made her determination that BTM was nonresponsible, both the DCMA and the SBA had concluded from their thorough audits of BTM's books, including a meticulous review of its capital and credit, that BTM's lack of financial resources rendered it unable to perform the contract.  See CAR 702 (observing that "both DCMA and the SBA have found that BTM has not demonstrated adequate financial capacity to perform the contract at two separate occasions").  Moreover, at the time that the contracting officer decided to eliminate BTM from the competition, BTM could at best state its expectation that it could cure its working capital issues "[                    ]," and, as the contracting officer observed, FAR 9.104-3(a) requires that "all working capital issues must be resolved at time of award to be considered responsible."  CAR 703.

BTM insists nonetheless that the findings of the DCMA and the SBA do not reflect BTM's ability to obtain resources because they "indicate[] working capital issues that have already been cured."  Pl.'s Resp. & Reply 4, ECF No. 18.  It argues that, by denying BTM the opportunity to submit its loan commitment letter on January 21, 2014, the contracting officer entirely failed to consider whether BTM could obtain adequate resources through outside funding.  Pl.'s Mot. for J. on Admin. R. 5, ECF No 9 [hereinafter Pl.'s Mot.].  This failure, BTM contends, was arbitrary, capricious, and contrary to law.

BTM's arguments are meritless.  As the administrative record reflects, the agency had before it and considered evidence of BTM's ability to obtain additional resources before it eliminated BTM from the competition.  Def.'s Mot. 9-10 (citing, e.g., CAR 825).  Specifically, the SBA financial specialist's report shows that she spoke with an official from BTM's [lender], who indicated that "the [   ] will not be able to approve a new LOC [line of credit]," that an SBA International Trade Specialist advised that a loan through the EWCP loan program "was not possible," and that "the company is currently at capacity on their existing [                    ]."  CAR 825.

Similarly before the agency and considered by it was BTM's January 9, 2014 letter, in which it stated that it expected to cure its working capital issues by [                    ].  CAR 701.  The agency found this assurance inadequate under FAR 9.104-3, which lists as exemplary of "acceptable evidence" of an ability to obtain financial resources "a commitment or explicit arrangement, that will be in existence at the time of contract award."  FAR 9.104-3(a) (emphasis added).

BTM argues that despite the fact that the agency considered BTM's ability to secure resources through outside funding before eliminating it from the competition, the contracting officer was required by FAR 9.104-3(a) to consider any evidence of responsibility that BTM might offer up until the time of a contract award.  It notes that the provision states that the contracting officer "**shall** require acceptable evidence of the prospective contractor's ability to obtain required resources."  Pl.'s Resp. & Reply 2 (emphasis BTM's) (quoting FAR 9.104-3(a)).  According to BTM, "[b]ecause FAR 9.104-3(a) uses the word 'shall' instead of 'may', the contracting officer was without any authority to unilaterally reject the Plaintiff's attempt to provide [a loan commitment letter] prior to award."  Pl.'s Resp. & Reply 2.

BTM's interpretation of FAR 9.104-3(a) conflicts not only with the considerable discretion given to contracting officers, which BTM itself acknowledges in its Motion at 4, but also with Federal Circuit case law that rejects a virtually identical  argument in John C. Grimberg Co., 185 F.3d at 1303.  In that case, the contracting officer had determined that the protester was nonresponsible, and the protester argued that the contracting officer erred when he "decided not to afford [the protester] the opportunity to cure" the problems related to its responsibility.  Id. at 1300.  Like BTM, the protester in John C. Grimberg Co. argued that "the contracting officer had a legal obligation to obtain further information" before making a nonresponsibility determination.  Id. at 1303.  Also like BTM, the protester cited the use of the word "shall" in the FAR—here, FAR 9.105-1(a)—for the proposition that the contracting officer has a duty, not discretion, to request additional evidence of responsibility.  John C. Grimberg Co., 185 F.3d at 1303 (quoting FAR 9.105-1(a)).  The Federal Circuit disagreed.  Although "shall" indeed

connotes a duty, the Federal Circuit acknowledged, the contracting officer's duty is only "to have, or to obtain, enough information to make a responsibility determination." Id. But what constitutes "enough information" is a question within the contracting officer's discretion to answer. Id. In short, "the contracting officer is the arbiter of what, and how much, information he needs." Id.

The Federal Circuit's interpretation of FAR 9.105-1(a) in John C. Grimberg Co. is highly instructive in determining the appropriate interpretation of FAR 9.104-3(a), the provision that BTM cites. Thus, although the contracting officer has the duty under that provision to "require acceptable evidence of the prospective contractor's ability to obtain required resources," FAR 9.104-3(a), she has the discretion to decide what constitutes evidence sufficient to make her determination.

BTM's reliance upon several decisions by the Government Accountability Office (GAO), is also unavailing. Pl.'s Mot. 6-7. BTM observes that responsibility is a matter distinct from responsiveness or acceptability, which must be fulfilled at proposal opening. Pl.'s Mot. 6. See also Centech, 554 F.3d at 1034 nn.2-3. It notes that the GAO has several times issued decisions articulating the principle that "[a] requirement that relates to responsibility may be satisfied at any time prior to award." Integrated Prot. Sys., Inc., B-254457 et al., 94-1 CPD ¶ 24 (Comp. Gen. Jan. 19, 1994). See also 3DAV Dev., Inc., B-274933 et al., 97-1 CPD ¶ 24 (Comp. Gen. Jan. 16, 1997); NFI Mgmt. Co., 69 Comp. Gen. 515 (1990).   BTM argues that the contracting officer here improperly converted a matter of responsibility into one of acceptability by refusing to consider its proffer of a loan commitment letter when no award had yet been made. Pl.'s Mot. 6-7; Pl.'s Resp. & Reply 4.

The GAO decisions that BTM cites, however, stand only for the proposition that a contracting officer may, in his or her discretion, consider evidence of responsibility submitted any time before award; they do not support BTM's very different (not to mention highly impractical) contention that the contracting officer must consider additional evidence submitted by an offeror up until the time of the contract award, even after the offeror has already been excluded from the competition. Integrated Protection Systems, for example, was a post-award bid protest in which a disappointed bidder argued that "the award . . . was improper because the [awardee] failed to submit, as required by the solicitation, a copy of its license with its bid documents." 94-1 CPD ¶ 24 at 2. The GAO rejected this argument, ruling that because a license requirement "involves the firm's responsibility rather than the responsiveness of the bid," that requirement "may be satisfied at any time prior to award," and "[c]onsequently, [there is] no basis to question the agency's decision to allow [the low bidder] to submit proof of its license after bid opening." Id. Similarly, the other GAO decisions that BTM cites, also post-award protests, hold that an agency may consider information beyond the proposal documents when determining an offeror's responsibility; they do not support BTM's contention that the agency must leave open the question of responsibility until it awards the contract. See 3DAV Dev., Inc., 97-1 CPD ¶ 24 at 2; NFI Mgmt. Co., 69 Comp. Gen. at 518.

In short, the agency was under no legal obligation to reconsider its nonresponsibility determination in this matter up until the contract award date. Further, its decision not to permit BTM to submit further evidence after it had already been found nonresponsible and eliminated

from the competition was neither arbitrary and capricious, nor an abuse of discretion.  To the contrary, it was eminently reasonable not to give BTM yet another bite at the apple.  As noted, by January 17, 2014, when BTM advised the contracting officer that it expected to submit a written loan commitment on January 21, there had already been two independent findings based on thorough audits that BTM was not financially responsible.  In addition, BTM had told the SBA only a month earlier that its [    ] was considering providing it with a loan guarantee, but that loan never materialized.  In fact, the [    ] advised the SBA that it would not be providing BTM with a [                ].  Under these circumstances, and given the Court's narrow scope of review, the contracting officer's decision not to reopen the matter again was clearly reasonable and must be upheld.  See Bender Shipbuilding & Repair Co. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002) ("When [nonresponsibility] decisions have a rational basis and are supported by the record, they will be upheld.").

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for judgment on the administrative record is **DENIED**, and the defendant's cross motion is **GRANTED**.  The Clerk is directed to enter judgment accordingly.

Pursuant to the Court's March 21, 2014 Protective Order, this Opinion and Order has been issued under seal.  The parties shall have two weeks to propose redactions and, accordingly, shall file such proposed redactions on or before Tuesday, August 5, 2014.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge